UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACEY MOSELEY,

          Plaintiff,        Civil Action No. 19-13147
                                     Honorable Paul D. Borman
v.                                      Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

**REPORT AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 12, 15)**

Plaintiff Tracey Moseley ("Moseley") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (ECF Nos. 12, 15), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Moseley was not disabled under the Act prior to February 23, 2017, is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment **(ECF No. 15)** be **DENIED**, Moseley's Motion for Summary Judgment **(ECF No. 12)** be **GRANTED IN PART** to the

extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** for further proceedings consistent with this Report and Recommendation.

## II.   REPORT

### A.   Background

Moseley was 44 years old at the time of her alleged onset date of August 30, 2011, and at 5'3" tall weighed approximately 200 pounds during the relevant time period. (Tr. 164, 167, 961). She completed high school and had training as a medical assistant. (Tr. 168, 191, 963). She worked as a hospital unit and/or medical office clerk for approximately fourteen years, until she had to stop working because of her medical conditions. (Tr. 167-68, 191, 948). She now alleges disability primarily as a result of back surgeries and continuing pain, bladder and bowel incontinence, neuropathy, and depression. (Tr. 167, 190, 949).

After Moseley's application for DIB was denied at the initial level on November 21, 2012 (Tr. 95-98), she timely requested an administrative hearing, which was held on November 12, 2014, before ALJ Patricia McKay (Tr. 31-69). Moseley, who was represented by attorney Kiel Roeschke, testified at that hearing, as did vocational expert Judith Findora. (*Id.*). On March 27, 2015, the ALJ issued a written decision finding that Moseley was not disabled under the Act. (Tr. 11-25). On August 29, 2016, the Appeals Council denied review. (Tr. 1-5).

Moseley timely filed suit in federal court, and on November 7, 2017, this Court issued a Report and Recommendation ("R&R") to grant in part her motion for summary

judgment, deny the Commissioner's motion for summary judgment, and remand the case for further proceedings. (Tr. 996-1011). The R&R was adopted by the Honorable Paul D. Borman on December 21, 2017. (Tr. 1012-13).

As a result, on May 11, 2018, the Appeals Council issued an Order remanding the case for further consideration. (Tr. 990-91). In its Order, the Appeals Council noted that Moseley had filed subsequent applications for DIB and Supplemental Security Income ("SSI") and had been found disabled as of February 23, 2017. (Tr. 990). However, the Appeals Council determined that the period prior to February 23, 2017 required further adjudication; thus, the Appeals Council ordered the ALJ to "offer the claimant the opportunity for a new hearing, take any further action needed to complete the administrative record, and issue a new decision for the period prior to February 23, 2017." (Tr. 991).

After remand, a second administrative hearing was held on August 5, 2019, before ALJ McKay. (Tr. 902-40). On August 27, 2019, ALJ McKay again denied Moseley's application for DIB, finding that she was not disabled under the Act prior to February 23, 2017. (Tr. 881-94). Moseley timely filed for judicial review of the final decision on October 28, 2019. (ECF No. 1).

The Court has thoroughly reviewed the transcripts in this matter, as well as Moseley's extensive medical record, function and disability reports, and testimony as to her conditions and resulting limitations. Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

3

### B. The ALJ's Application of the Disability Framework Analysis

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first

four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

After remand, following this five-step sequential analysis, ALJ McKay concluded that Moseley was not disabled under the Act between August 30, 2011 (the alleged onset date) and February 23, 2017 (the date on which she was found disabled). At Step One, the ALJ found that Moseley did not engage in substantial gainful activity during the relevant time period. (Tr. 884). At Step Two, the ALJ found that, during the relevant time period, Moseley had the severe impairments of multilevel degenerative disc disease and disc herniation with history of lumbar radiculopathy, status post discectomy and laminectomy of the thoracic spine; left ulnar neuropathy; cervical disc degeneration with radicular symptoms; thoracic myelopathy; and obesity. (*Id.*). At Step Three, the ALJ found that Moseley's impairments, whether considered alone or in combination, did not meet or medically equal a listed impairment. (Tr. 886).

The ALJ then assessed Moseley's residual functional capacity ("RFC"), concluding that, during the relevant period of time, she was capable of performing sedentary work, with the following limitations: could occasionally kneel and stoop but never crawl; could climb stairs no more than 10% of the day; could not lift from floor to desktop; needed to avoid workplace hazards like dangerous, moving machinery and unprotected heights; could not climb ladders, ropes, or scaffolds; could frequently push, pull, and reach with the bilateral upper extremities, but could only occasionally reach overhead; could not use foot controls with the bilateral lower extremities; could occasionally be exposed to humidity,

5

heat, cold, and vibratory environments; needed to use an assistive device to walk distances greater than one standard city block; and required opportunities for short (e.g., about two minutes) breaks every hour. (Tr. 887).

At Step Four, the ALJ found that, through February 22, 2017, Moseley was capable of performing her past relevant work as a hospital insurance clerk and unit clerk. (Tr. 893). As a result, the ALJ concluded that Moseley was not disabled under the Act between August 30, 2011 and February 22, 2017. (*Id.*).

**C.   Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at

6

512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

  **D.**   **Analysis**

As set forth above, the ALJ concluded that, during the relevant period of time, Moseley was capable of performing sedentary work, with the following limitations: could occasionally kneel and stoop but never crawl; could climb stairs no more than 10% of the day; could not lift from floor to desktop; needed to avoid workplace hazards like dangerous, moving machinery and unprotected heights; could not climb ladders, ropes, or scaffolds; could frequently push, pull, and reach with the bilateral upper extremities, but could only occasionally reach overhead; could not use foot controls with the bilateral lower extremities; could occasionally be exposed to humidity, heat, cold, and vibratory environments; needed to use an assistive device to walk distances greater than one standard

7

city block; and required opportunities for short (e.g., about two minutes) breaks every hour. (Tr. 887). Moseley now argues that the ALJ's RFC assessment is not supported by substantial evidence – particularly with respect to her need for an assistive device and her need for "short" breaks every 45 minutes to one hour.[1] (ECF No. 12, PageID.2707-12). For the reasons set forth below, the Court agrees and finds that remand is warranted.

    1.    *The Relevant Medical Evidence*[2]

On August 26, 2011, Moseley saw Geoffrey Seidel, M.D. regarding chronic posterior thoracic and lumbar pain radiating to the right lower extremity and right abdomen. (Tr. 590). Dr. Seidel reviewed a May 2011 MRI of the lumbar spine, which showed right paracentral disc protrusion at T10-11, mild-to-moderate central canal stenosis, and moderate-to-severe lateral recess stenosis at L4-5 affecting the L4 descending nerve roots and L5 nerve roots. (Tr. 429, 592). He also reviewed a June 2011 MRI of the

---

[1] Moseley also argues that the RFC is not supported by substantial evidence for several other reasons, including the fact that it failed to take into account the side effects of her medications, her need for a sit/stand option, her inability to handle and finger, and her mental health limitations. (ECF No. 12, PageID.2708). Because the Court is recommending remand on other grounds, it need not address the merits of these arguments in detail. On remand, however, the ALJ should take care to thoroughly and properly consider all of the issues raised by Moseley, as well as her lengthy work history, which was not mentioned in the decision. As Moseley has been determined to be disabled as of February 23, 2017, it would also seem appropriate for the ALJ to specifically distinguish any differences between Moseley's functional limitations before and after that date. (*Cf.* Tr. 893 ("The evidence shows that [Moseley's back pain and functioning] gradually worsened, but prior to February 23, 2017, it did not prevent her from performing primarily seated work activity with the above postural, reaching, and environmental limitations.")).

[2] Given that the 2,626-page transcript in this case is perhaps the lengthiest one this Court has seen, it is impossible to discuss all of the medical evidence it contains without unduly bogging down the Court's ruling. Thus, although the Court will not summarize all of Moseley's medical records, they have been reviewed and considered; for brevity's sake, however, the Court will discuss in detail only that medical evidence which is most relevant to its ruling.

thoracic spine, which showed no cord signal abnormality in the thoracic region but did show multiple disc protrusions and moderate canal stenosis at T7-8 and T10-11. (Tr. 427, 592). An electrodiagnostic examination performed by Dr. Seidel on September 9, 2011 was abnormal, with left lower lumbar paraspinal denervation evident. (Tr. 586). At a follow-up visit to Dr. Seidel on September 21, 2011, Moseley reported developing bladder and bowel incontinence. (Tr. 584). Dr. Seidel indicated he was "**quite concerned**" about Moseley's incontinence and therefore referred her for a neurosurgical consultation. (*Id.*) (emphasis in original). As a result, Moseley saw Marilyn Gates, M.D. (Tr. 393), and she subsequently was hospitalized from October 14, 2011 to October 23, 2011, when she underwent a T10-11 discectomy and laminectomy. (Tr. 263).

Although Moseley was expected to recover within a few months of this surgery, she continued to complain of severe back pain and incontinence. (Tr. 380, 387, 389). An MRI performed on January 6, 2012 showed multiple thoracic spine disc protrusions with cord involvement at T10-11, as well as bulging discs in the lumbar spine with L4 nerve root impingement. (Tr. 487-88). As a result, Moseley was admitted to Henry Ford Hospital from February 14-29, 2012 for a T7-11 spinal fusion. (Tr. 326-27). At discharge, she was ambulating with a rolling walker. (Tr. 336).

At a follow-up visit to Dr. Seidel in April 2012, Moseley complained of heaviness in her legs, urinary and bowel incontinence, and urinary frequency. (Tr. 577). In May 2012, she had a nerve conduction study that showed bilateral lower extremity peripheral neuropathy (Tr. 568) and an MRI of the thoracic spine that showed: disc desiccation at multiple levels; facet arthritic changes at multiple levels; disc bulging at T7-8 with a lateral

herniated component resulting in foraminal narrowing and moderate to tight canal stenosis; disc bulging at T8-9 with protrusion indenting the anterolateral margins of the thecal sac; foraminal narrowing and canal stenosis at T8-9; disc bulging with right paracentral protrusion flattening the ventral and paracentral margins of the thecal sac with facet arthropathy; and tight canal stenosis (Tr. 2565-67).

In June 2012, Dr. Seidel noted that Moseley's incontinence was improving, but she still had the urge to go to the bathroom frequently and had to respond; otherwise, there were "episodes of bladder leakage or bowel accident." (Tr. 567). Nevertheless, Dr. Seidel agreed to allow Moseley to look for secretarial work, but only if she was allowed to sit or stand as needed, was allowed frequent unscheduled bathroom breaks, and was limited to no more than four hours of work, three days a week. (*Id.*). Moseley was unable to find such accommodated work, so she decided to try to pursue a college education. But, she attended classes only two days a week and was unable to tolerate even that schedule for very long due to an inability to sit for long periods of time and difficulty concentrating. (Tr. 552, 556, 963-64). In July 2013, Dr. Seidel noted that Moseley's bladder and bowel urgency was worsening, she was having "accidents," and she needed "almost immediate access to [a] bathroom." (Tr. 552). He also indicated that she "never [was] truly continent of bowel and bladder" and that she was "not able to function within the work force." (Tr. 553).

On July 19, 2013, Dr. Seidel completed a Lumbar Spine RFC Questionnaire, assessing that Moseley was: likely to be "off task" 25% of the time or more in a typical workday; likely to have "good days" and "bad days"; likely to be absent from work more

10

than four days per month due to her impairments and treatment; and likely to need unscheduled breaks due to bowel/bladder incontinence at random intervals. (Tr. 659-62). He opined that Moseley's physical limitations included rarely lifting less than ten pounds; needing periods of walking around; sitting less than two hours in an eight-hour day; standing/walking less than two hours in an eight-hour day; and walking only one city block without rest or severe pain. (*Id.*). Dr. Seidel also described Moseley's prognosis as "guarded for any significant improvement." (Tr. 659).

Moseley underwent a physical consultative examination on September 13, 2012, with Jose Mari Jurado, M.D., who noted that she ambulated with a cane. (Tr. 606-12). On examination, there was ankle clonus, discordant perception head-to-toes, limited range of motion in the lumbar spine, straight leg raise pain at 35 degrees on the right and 15 degrees on the left, and a positive Valsalva test in the thoracic and lumbar spine. (Tr. 607-08). Dr. Jurado noted that Moseley's gait was "slow and shaky" and opined that a cane was clinically required, as she would fall without it. (Tr. 608, 612).

Subsequent records from Dr. Seidel from March and July 2014 indicated tenderness in the thoracic and lumbar spine, 40% decreased sensation to pinwheel in the ulnar nerve distribution in the left arm, 30% reduced sensation to pinwheel in the C6 nerve root distribution in the left arm,[3] reduced range of motion in the neck, and reduced bending. (Tr. 740-41, 748-49). Dr. Seidel continued to further observe that Moseley had a neurogenic bladder and neurogenic bowel, struggled with gait and balance, and again

---

[3] A March 26, 2014 EMG was significant for left ulnar neuropathy at the elbow. (Tr. 745).

11

opined that she could not function in the workforce at all. (Tr. 740-41).

Throughout 2015 and 2016, Moseley continued to treat with Dr. Seidel for chronic bladder and bowel incontinence, chronic pain, and lower extremity weakness. (Tr. 1179-1214). During that time, Dr. Seidel diagnosed her with neurogenic bladder and bowel that required frequent voiding and a bowel program to manage her symptoms. (Tr. 1206). His examinations noted that Moseley's legs were spastic, weak, and hyper reflexive, which was indicative of thoracic myelopathy. (Tr. 1179, 1190, 1207-08, 1213). He further opined that Moseley had "limited" tolerance for sitting or standing and that she required a cane. (Tr. 1190-91, 1207-08). As late as December 2016, Dr. Seidel continued to opine that Moseley could not work in any capacity, and he stood by his prior Lumbar Spine RFC Questionnaire, indicating that she had no change in her spine based on recent x-rays.[4] (Tr. 1179-80).

In May 2016, Moseley began treating with rheumatologist Samir Yahia, M.D. She reported pain, swelling, and stiffness in her hands that had started approximately six months earlier and worsened over time. (Tr. 1392). On examination, Dr. Yahia noted tenderness, swelling, and restricted range of motion in the hands and wrists, tenderness at the elbows, and severe pain with restricted range of motion in the neck and lower back. (Tr. 1394). X-rays of the hands revealed scattered arthritic changes; lab work confirmed a

---

[4] Interestingly, the state agency physician who reviewed Moseley's medical records on February 14, 2017, Keith Camann, indicated that he gave "high weight" to the exams and recommendations of both Dr. Seidel and Moseley's treating rheumatologist, Samir Yahia, M.D., and specifically "refer[red] the interested reader" to Dr. Seidel's December 29, 2016 opinion as to Moseley's RFC. (Tr. 1053). As noted above, the Commissioner has already determined that Moseley was disabled as of February 23, 2017.

12

positive ANA test; and Moseley was diagnosed with an undifferentiated connective tissue disease suggestive of lupus. (Tr. 1395, 1397-98, 1413).

On January 17, 2017, Moseley underwent a physical consultative examination with Molly Rossknecht, D.O. (Tr. 2603-07). On examination, Dr. Rossknecht documented lumbar and thoracic spine tenderness, lumbar spine range of motion limitations, severe difficulty getting on and off the examination table, and severe difficulty squatting. (Tr. 2605-06). Additionally, Dr. Rossknecht noted that Moseley ambulated with a cane with a "small-stepped, slow and steady gait[.]" (*Id.*).

### 2. *The RFC is Not Supported by Substantial Evidence*

As set forth above, Moseley argues that the ALJ's RFC assessment "falls woefully short of including the entirety of [her] documented limitations." (ECF No. 12, PageID.2708). An RFC describes an individual's residual abilities, despite her limitations. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002). The "RFC is to be an 'assessment of [a claimant's] remaining capacity for work' once her limitations have been taken into account." *Id.* (citing 20 C.F.R. § 416.945). In determining a claimant's RFC, it is necessary to consider (1) objective medical evidence, as well as (2) subjective evidence of pain or disability. *See* 20 C.F.R. § 404.1545(a)(1) (RFC must be based on all "relevant evidence"). In crafting the RFC, the ALJ must consider the alleged physical, mental, and environmental restrictions. *See* 20 C.F.R. § 404.1545(b-d); *Social Security Ruling* ("SSR") 96-8p, 1996 WL 374184, at *6 (June 2, 1996).

#### a. *Incontinence*

Moseley first argues that the ALJ failed to adequately address the limitations she

13

faces as a result of incontinence. Specifically, Moseley challenges the ALJ's decision to include in the RFC only a two-minute break each hour to use the restroom "based off of an estimate she admits she doesn't know how to properly define." (ECF No. 12, PageID.2708-09). The Court agrees that this particular limitation is not supported by substantial evidence.

> The relevant testimony from Moseley's second administrative hearing is as follows:
>
> Q. [by ALJ] … And then, you also mentioned frequent bathroom breaks. Now, you know, Social Security considers frequent two thirds of the day. Is that how you mean frequent?
>
> A. [by Medical Expert, Andrew Brown, M.D. ("ME")] No. I – that would be excessive.
>
> Q. So, what do you mean –
>
> A. But I would think –
>
> Q. – by frequent?
>
> A. – that she would require a bathroom break at least every hour, 45 minutes to an hour, she would require…. She could not be in an environment in which bathroom breaks were restricted, because at times she'd be – may be more frequent, at times she may be less frequent. It – it's something that it – it's not something that's predictable, per se….
>
> Q. With these bathroom breaks, is there – was there any information to tell you how long these might take for a bathroom break? Was there – are we talking like a 15-minute bathroom break? Are we talking like a minute? Was there –
>
> A. No. I –
>
> Q. – any –
>
> A. I –
>
> Q. – information?

14

> A. The bathroom breaks should be short, usually. I didn't see that she so much had difficulty initiating as much as inability to hold, so the bathroom break should be short. It shouldn't be a long bathroom break.
>
> Q. Uh-huh.
>
> A. But the spastic bladder can cause some urgency.

(Tr. 920-21). Then, upon further questioning by Moseley's attorney, Wesley Lamey, the VE testified:

> Q. [by Mr. Lamey] … In regards to the bathroom breaks, you had mentioned that they could be unpredictable. And, you noted the issues with the bladder specifically, but there is evidence in there regarding bowel incontinence as well. Is it fair to say that those – that that would be an issue and could require longer bathroom breaks than what you had talked about?
>
> A. [by ME] Again, **not necessarily longer**. **This is not something where she's having difficulty initiating** it as much as it – it's the urgency.
>
> Q. Okay.
>
> A. So I'm not sure it takes – **unless there's an accident**. You know, unless –
>
> Q. Sure.

(Tr. 927) (emphasis added). Subsequently, the ALJ posed questions to the VE about Moseley's ability to perform her past relevant work if she required such bathroom breaks:

> Q. … If our hypothetical person needed to take breaks at least every 45 minutes to an hour to use the restroom – and, he indicated it would be short. **Didn't really define short, but I'm thinking short would be maybe two minutes to use the restroom. I personally have never timed myself, so I don't really know how to define that.** How does that affect one's ability to do these jobs? Could she still do the jobs with that understanding of a short break being about two minutes every 45 minutes to an hour?
>
> A. Yes.

15

(Tr. 934) (emphasis added).

As Moseley argues, and as the medical evidence cited above demonstrates, she consistently complained of incontinence throughout the relevant time period. Dr. Seidel routinely diagnosed her with neurogenic bladder and bowel incontinence requiring a treatment plan that included frequent unpredictable bladder emptying and a bowel program to manage her symptoms. (Tr. 1206). Yet, he continued to note that Moseley's incontinence included "accidents," was "worsening" despite bouts of slight improvement, and that she was "never truly continent of bowel and bladder." (Tr. 552-53). Consequently, in one note, Dr. Seidel found that Moseley needed "almost immediate access to [a] bathroom." (Tr. 552).

Here, then, where the ME acknowledged that if there were "accidents" the bathroom breaks *would be* longer than a typical bathroom break (Tr. 927), and where there is medical evidence that such accidents did in fact occur and was an ongoing concern for Moseley, and that Moseley needed "almost immediate access" to a bathroom, the ALJ's decision to limit her to two-minute bathroom breaks is not supported by substantial evidence.[5] This is particularly true where the RFC contains no mention of how close Moseley's workstation must be to a restroom. Indeed, as Moseley aptly summarized:

> It also does not logically follow that someone with "severe" difficulty getting on and off an examination table, who requires the use of underwear liners, and needs a can[e] to stand and walk, would be able to get up from a work station, walk to the bathroom, use the restroom,

---

[5] Interestingly, at the beginning of the second administrative hearing, ALJ McKay advised Moseley that she would be required to testify. (Tr. 910). Later, however, she indicated there was no such need. (Tr. 931). Perhaps it would have been useful to question Moseley as to the frequency and length of her required restroom breaks.

> change their underwear pad, and return to the workstation in two minutes. The ALJ admitted her two-minute break was a random guess.[6] Without even including the other issues lacking in the ALJ's RFC it is reasonable to assume [Moseley] would exceed the six minutes per hour the VE stated would be allowable for time-off task. Especially considering the random and unpredictable nature of using the restroom.

(ECF No. 12, PageID.2710). For these reasons, the Court finds that this aspect of the ALJ's RFC assessment is not supported by substantial evidence. *See, e.g., Durr-Irving v. Colvin*, 600 F. App'x 998, 1003 (7th Cir. 2015) (finding evidence of urinary incontinence "highly relevant" where a VE testified that a person who must use the restroom more than once an hour would be unable to perform the few jobs that met the ALJ's assessment of an applicant's RFC)

### b. Assistive Device

Moseley also argues that "the ALJ's inclusion of a hand-held assistive device for ambulation of greater than a city block in her RFC is woefully lacking in support." (ECF No. 12, PageID.2711). As set forth above, the medical evidence clearly establishes that Moseley was prescribed – and indeed consistently used – a cane during the relevant time period. Dr. Seidel believed this was necessary, opining that she required a cane. (Tr. 1190, 1208). Consultative examiner Dr. Jurado opined that Moseley needed a hand-held device to prevent her from falling. (Tr. 612). Despite assigning Dr. Jurado's opinion "great

---

[6] The Court does question whether, in light of all of these challenges, two minutes would generally be sufficient for Moseley. But the more important point is that the ALJ's two-minute estimate was based on Dr. Brown's testimony regarding the amount of time Moseley would need for a *regular* bathroom break (*i.e.*, one with no "initiating" issues), not one that takes all of these challenges into account. (*See supra* at 15; Tr. 927).

17

weight" after finding it "based on a thorough examination" and "consistent with the overall evidence showing issues with gait[,]" the ALJ did not include in the RFC Moseley's need for a cane when she was standing or walking – only when she was walking "distances greater than one standard city block."[7] (Tr. 887, 892). This inconsistency is not necessarily harmless, as the VE at Moseley's first administrative hearing testified that the use of a cane while standing would preclude all work (Tr. 975-76).

In sum, because the Court cannot find that these errors in the ALJ's RFC analysis are harmless, remand is required.

## III.  CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 15)** be **DENIED**, Moseley's Motion for Summary Judgment **(ECF No. 12)** be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** for further proceedings consistent with this Report and Recommendation.

---

[7] The Commissioner asserts that Moseley "never argues that the ALJ could not rely on [medical expert Dr. Brown's] opinion [testimony], which was based on a review of the entire medical record, and which includes the finding that any ambulation 'outside an office environment or longer distances would most likely require a cane.'" (ECF No. 15, PageID.2735) (internal citations omitted). But, this testimony – on which the ALJ relied at the second administrative hearing – is, at best, equivocal as to the circumstances when Dr. Brown believed Moseley needed a cane. Specifically, although Dr. Brown initially testified as the Commissioner indicates – that "anything outside an office environment or longer distances would most likely require a cane" – he later testified that "anything outside of the house would require a cane." (Tr. 918-19). Thus, there is some internal inconsistency in Dr. Brown's testimony itself.

18

Dated: February 2, 2021  s/David R. Grand
Ann Arbor, Michigan  DAVID R. GRAND
United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. L.R. 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. L.R. 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 2, 2021.

                                                          s/Eddrey O. Butts
                                                        EDDREY O. BUTTS
                                                        Case Manager